**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| EPEC POLYMERS, INC., | : | |
| | : | |
| Plaintiff, | : | Civil Action No. 12-3842 (MAS) (TJB) |
| | : | |
| v. | : | |
| | : | |
| NL INDUSTRIES, INC., | : | **MEMORANDUM OPINION** |
| | : | |
| Defendant. | : | |

**SHIPP, District Judge**

This matter comes before the Court on Defendant NL Industries Inc.'s ("Defendant" or "NL") Motion to Dismiss pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(6). (Def.'s Br., ECF No. 10-1.) Plaintiff EPEC Polymers, Inc. ("Plaintiff" or "EPEC"), filed Opposition. (Pl.'s Opp'n, ECF No. 12.) Defendant filed a Reply. (ECF No. 15.) The Court has carefully considered the Parties' submissions and decided the matter without oral argument pursuant to Rule 78. For the reasons set forth below, and other good cause shown, Defendants' Motion to Dismiss is GRANTED in part and DENIED in part.

**I.    Background**

**A.    Factual History**

The following facts are drawn from the Complaint and are taken as true for purposes of this Opinion. EPEC is a Delaware corporation with its principal place of business located in Texas. (Compl. ¶ 1, ECF No. 1.) EPEC owns a parcel of land in an industrial area of Woodbridge Township, New Jersey, situated along the northern shore of the Raritan River (the "EPEC Site").

(*Id.* ¶ 5.) The EPEC Site was used for the production of chemical products by EPEC and its predecessors in interest, Heyden Chemical Corporation ("Heyden"), Heyden-Newport Corporation and Tenneco Chemical Company. The EPEC Site covers a total of approximately 185 acres that are in varied states of use. (*Id.* ¶ 7.) The southern two-thirds of the EPEC Site are wetlands and are divided by berms created by the United States Army Corps of Engineers ("Army Corps") into the Central and Southern Wetlands. (*Id.* ¶¶ 8-10.) This lawsuit concerns the Central Wetlands, which cover approximately 45 acres. (*Id.* ¶ 11.)

NL is a New Jersey corporation with its principal place of business located Dallas, Texas. (*Id.* ¶ 2.) Directly across the Raritan River from the EPEC Site, but within the Borough of Sayreville, lies property formerly owned by NL and its predecessors that was also used for production of chemical products (the "NL Site"). (*Id.* ¶¶ 12-17.) Chemical production operations were active at the NL Site from 1935 until 1982. (*Id.* ¶ 13.) Plaintiff alleges that the production of these chemicals, and their ensuing disposal, render the NL Site a "facility" for purposes of liability. (*Id.* ¶ 108.) When referring to the NL Site for purposes of liability, and as explained more fully below, the Court, as does Plaintiff, will use the term "NL Facility."

Plaintiff's Complaint alleges that hazardous waste and by-product materials generated at the NL Site/Facility in the form of thorium, uranium and radium (the "Radiological Materials") were dumped by NL and its predecessors into the Raritan River between the years of 1935 and 1947. (*Id.* ¶¶ 14-38.) "As a result of these discharges," Plaintiff alleges that "the Radiological Materials came to be located in the Raritan River sediments." (*Id.* ¶ 39.)

Prior to the discharge of the Radiological Materials, the Raritan River underwent a series of dredging projects to widen and deepen a channel for shipping. (*Id.* ¶¶ 40-45.) That process continued when discharge of the Radiological Materials was occurring. In or around 1940, and pursuant to the 1937 River and Harbor Act and the National Defense River and Harbor Act, Pub.

L. No. 76-868, the Raritan River was targeted by the Army Corps for further dredging. (*Id.* ¶¶ 52-53.) The Army Corps contacted landowners and businesses along the banks of the Raritan River to "secure locations for the deposition of dredge spoils that would be generated" by further dredging. (*Id.* ¶ 54.) EPEC's predecessor, Heyden, entered into an agreement with the Army Corps for the placement of dredge spoils on the Central Wetlands. (*Id.* ¶¶ 55-56.) Dredging commenced in December 1940, but no dredge spoils were deposited on the Central Wetlands until 1943. (*Id.* ¶¶ 57-62.) From approximately 1943 to 1947, "dredge spoils removed from the Raritan River . . . were placed on the Central Wetlands portion of the EPEC [Site]." (*Id.* ¶ 63.)

Skipping forward nearly sixty-five years to "April 2009, EPEC performed a gamma surface survey at the EPEC [Site]" that "detected the presence of elevated levels of thorium in the soils." (*Id.* ¶ 65-66.) According to EPEC, "[t]horium was never produced, generated and/or used at the EPEC [Site]." (*Id.* ¶ 67.) Furthermore, "[s]ubsequent investigations at the . . . Central Wetlands have revealed elevated levels of thorium and the other Radiological Materials in the Central Wetlands (the "Radiological Contamination")." (*Id.* ¶ 70.) Plaintiff contends that the source of the Radiological Contamination is the Radiological Materials discharged by Defendant into the Raritan River and removed to the Central Wetlands by the Army Corps' dredging process. (*Id.* ¶¶ 71-77.)

Plaintiff has spent "over $2 million investigating the Radiological Contamination in the Central Wetlands" and believes it will continue to "incur significant costs related to the investigation and/or remediation of the" contamination. (*Id.* ¶¶ 84-85.) Remediation is anticipated to include, but not be limited to, "the excavation, transportation, and disposal of soils and other material containing [the] Radiological Contamination." (*Id.* ¶ 85.) The damages from the contamination also extend to the natural resources and wetlands located within the Central Wetlands. (*Id.* ¶ 86.)

3

### B.    Plaintiff's Complaint

Plaintiff's Complaint seeks to hold Defendant liable via several theories: 1) common law trespass; 2) common law private nuisance; 3) several causes of action pursuant to the federal Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9601 *et. seq.*, as amended by the Superfund Amendments and Reauthorization Act of 1986 ("SARA"), Pub. L. 99–499, 100 Stat. 1613 (1986), including a cost recovery action pursuant to § 9607(a), contribution pursuant to § 9613(f), and declaratory judgment pursuant to § 9613(g)(2); 4) declaratory judgments pursuant to 28 U.S.C. § 2201 and N.J. Stat. Ann. § 2A:16-50, *et. seq.*; 5) the New Jersey Spill Compensation Act pursuant to N.J. Stat. Ann. § 58:10-23.11 *et. seq.*; 6) negligence; 7) strict liability; and 8) common law indemnification.

## II.    Legal Standard

### A.    Standard for Motion to Dismiss

Rule 8(a)(2) "requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to give the defendant fair notice of what the . . . claim is and the grounds on which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). On a motion to dismiss for failure to state a claim, a "defendant bears the burden of showing that no claim has been presented." *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005).

A district court conducts a three-part analysis when considering a Rule 12(b)(6) motion. *Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011). "First, the court must 'take note of the elements a plaintiff must plead to state a claim.'" *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009)). Second, the court must accept as true all of a plaintiff's well-pleaded factual allegations and construe the complaint in the light most favorable to the plaintiff. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-11 (3d Cir. 2009). The court, however, must disregard any

4

conclusory allegations proffered in the complaint. *Id.* For example, the court is free to ignore legal conclusions or factually unsupported accusations which merely state that "the-defendant-unlawfully-harmed-me." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555). Finally, once the well-pleaded facts have been identified and the conclusory allegations ignored, a court must next determine whether the "facts alleged in the complaint are sufficient to show that plaintiff has a 'plausible claim for relief.'" *Fowler*, 578 F.3d at 211 (quoting *Iqbal*, 556 U.S. at 679).

Determining plausibility is a "context-specific task which requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. Plausibility, however, "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* at 678 (quoting *Twombly*, 550 U.S. at 545). In the end, facts which only suggest the "mere possibility of misconduct" fail to show that the plaintiff is entitled to relief. *Fowler*, 578 F.3d at 211 (quoting *Iqbal*, 556 U.S. at 679).

## III.   Analysis

Defendant moves pursuant to Rule 12(b)(6) to dismiss all of Plaintiff's CERCLA claims, as well as Plaintiff's common law trespass claim, common law private nuisance claim and common law contribution claim.

### A.    Plaintiff's CERCLA Claims

#### 1)    CERCLA Generally

CERCLA and SARA "were enacted to provide for liability and remediation of hazardous substances in the environment and for cleanup of inactive hazardous waste sites." *New Jersey Tpk. Auth. v. PPG Indus., Inc.*, 197 F.3d 96, 103 (3d Cir. 1999) ("*PPG*"). "CERCLA and SARA together create two legal actions by which parties that have incurred costs associated with cleanups can recover some or all of those costs: (1) Section [9607] cost recovery actions; and (2) Section [9613] contribution actions." *Morton Int'l, Inc. v. A.E. Staley Mfg. Co.*, 343 F.3d 669,

675 (3d Cir. 2003). CERCLA is a strict liability statute which imposes liability jointly and severally upon potentially responsible parties ("PRPs") "for costs associated with cleanup and remediation." *PPG*, 197 F.3d at 104. Section 9607 only provides three enumerated defenses, none of which are relevant to this case. *See* 42 U.S.C. § 9607(b). Here, Plaintiff has sought relief under both Sections 9607 and 9613, each of which will be addressed in turn.

### 2)   Plaintiff's Cost Recovery Claim — 42 U.S.C. § 9607(a)

The Third Count of Plaintiff's Complaint seeks recovery of "all costs incurred by EPEC in connection with the investigation and/or remediation of hazardous substances and/or material discharged and/or released from the NL Facility that came to be located on the EPEC [Site]." (Compl. ¶ 117.) This count relies on two distinct theories of CERCLA liability: 1) "owner/operator" liability; and 2) "arranger" liability. (*See id.* ¶¶ 108-14.) For the reasons stated more fully below, both EPEC's owner/operator and arranger liability claims state a *prima facie* cause of action under § 9607(a) and survive NL's Motion to Dismiss.

### a)   Plaintiff's Owner/Operator Theory

CERCLA liability under § 9607 requires a plaintiff to prove: "1) that the defendant is a PRP; 2) that hazardous substances were disposed of at a 'facility'; 3) that there has been a 'release' or 'threatened' release of hazardous substances from the facility into the environment; and 4) that the release or threatened release has required or will require the plaintiff to incur 'response costs.'" *PPG*, 197 F.3d at 103-04. The PRPs relevant to the current case are "1) the current owner or operator of a facility; 2) any person who owned or operated the facility at the time of the disposal of a hazardous substance; and 3) any person who arranged for disposal or treatment, or arranged for transport for disposal or treatment of hazardous substances at a facility . . . ." *Id.*

6

### i.   The Parties' Positions

The Complaint alleges that the "NL Facility is a 'facility' within the meaning of 42 U.S.C.

§ 9601(9)." (Compl. ¶ 108.) In more detail, Plaintiff's first theory of liability under Section 9607

alleges:

> (1) EPEC is the owner of the EPEC [Site] . . . ; (2) NL owned and operated the NL
> Facility [on the NL Site] . . . ; (3) NL discharged waste material from the NL
> Facility containing Radiological Materials into the Raritan River that became
> located in the river sediments . . . ; (4) the dredge spoils that were placed on the
> EPEC [Site] contained Radiological Material from NL's discharge and/or release
> of waste materials from the NL Facility . . . ; (5) Radiological Materials that were
> released and/or discharged from the NL Facility into the Raritan River came to be
> located and/or placed on the EPEC [Site] . . . ; (6) EPEC has incurred and will
> continue to incur response costs as a result of NL's Radiological Material that are
> present or came to be located on the EPEC [Site] . . . ; (7) such costs were incurred
> consistent with the National Contingency Plan [created as part of CERCLA] . . . .

(Pl.'s Br. 8; *see generally* Compl. ¶¶ 107-13.)

Defendant argues that the EPEC Site is the only "facility" relevant to EPEC's claims

because the NL Facility/Site is "not the facility at which the hazardous waste came to be located

or where EPEC allegedly has incurred 'response costs' for which it now seeks recovery under

CERCLA." (Def.'s Br. 12.) Thus, NL argues, because it never owned or operated the EPEC Site

it cannot be liable as an owner/operator for any hazardous materials located there. (*Id.*) Plaintiff

disputes NL's contentions and argues that "[t]here is no authority in CERCLA, or in the case law

interpreting it, that owner/operator liability attaches only if the discharger owned or operated the

location at which the release from its facility *came to be located*." (Pl.'s Opp'n 10.)

### ii.   Discussion

NL's argument that the EPEC Site is the only "facility" in question for purposes of this

case, and that its lack of ownership of the EPEC Site bars Plaintiff's owner/operator claim, does

not persuade the Court. Plaintiff's third count alleging liability pursuant to § 9607(a) and based

upon owner/operator liability states a *prima facie* cause of action and will be allowed to proceed.

7

The Parties primarily discuss four cases regarding Defendant's argument. Each of those cases interpret the breadth of the term "facility" as defined by CERCLA. CERCLA defines a "facility" as:

> (A) any building, structure, installation, equipment, pipe or pipeline (including any pipe into a sewer or publicly owned treatment works), well, pit, pond, lagoon, impoundment, ditch, landfill, storage container, motor vehicle, rolling stock, or aircraft, or (B) any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located; but does not include any consumer product in consumer use or any vessel.

42 U.S.C. § 9601.

Defendant states that the Third Circuit in *PPG* "emphasized the importance of limiting identification of the 'facility' at issue to the specific site giving rise to the cost recovery claim." (Def.'s Br. 12 (citing *PPG*, 197 F.3d at 105).) In *PPG*, the New Jersey Turnpike Authority sought to hold producers of chromate ore processing residue ("COPR") liable under CERCLA for remediation costs arising from "seven different sites along the New Jersey Turnpike that the Turnpike alleges have been contaminated with COPR." *PPG*, 197 F.3d at 99. The *PPG* Court interpreted the Turnpike Authority's claims as alleging: "the eastern spur of the New Jersey Turnpike is the 'facility' in question, and that the sites at issue here can be considered the environmentally impacted portions of the overall 'facility' for the purposes of determining whether the appellees are liable." *Id.* at 105.

The Third Circuit rejected that concept and held that "allowing the 'facility' to be the entire eastern spur, where the Turnpike's claim seeks costs relating to seven specific sites, would result in an unwarranted relaxation of the [causal nexus] required [to prove a link between the COPR producing defendants and the seven sites owned by the Turnpike]." *Id.* According to Defendant, the relevant facility was "not the property from which the COPR originated" but was,

rather, "the site where [the] defendants were alleged to have deposited or caused the disposal of COPR and at which the Authority incurred response costs." (Def.'s Br. 13.)

Plaintiff responds that Defendant has misread *PPG* and taken its causation analysis out of context. According to Plaintiff, in *PPG* the Turnpike "attempted to circumvent [CERCLA's causation requirements] by arguing that the entire eastern spur of the New Jersey Turnpike should be considered a single "facility" for CERCLA liability purposes . . . ." (Pl.'s Opp'n 11.) Moreover, Plaintiff contends that *PPG* "addressed the 'causation requirements' for the definition of [a] 'facility' under an *arranger* liability analysis . . . and did not address the definition of [a] 'facility' with respect to owner/operator liability . . . ." (*Id.* at 11 (emphasis added).)

Regarding *PPG*, Plaintiff has the stronger argument. First, the Turnpike was alleging a form of arranger liability, not owner/operator liability. *PPG*, 197 F.3d at 105 ("The Turnpike argues that all three appellees are PRPs by virtue of their having *arranged* for disposal and transport of the COPR at the seven sites.") (emphasis added). Second, because the Turnpike had failed to demonstrate the required "connection between the actions of the [defendants] and the COPR contamination at the sites in question," no claim for arranger liability could be supported. *Id.* As such, the alternative attempt by the Turnpike to expand the facility to the entire eastern spur of the Turnpike, rather than focus on the defendant COPR producers' ties to the seven sites, was viewed as "an unwarranted relaxation of the [causal] 'nexus' required," even when taking into account the "remedial purpose of CERCLA and less stringent notions of proof and causation underlying a CERCLA claim." *Id.* Contrary to NL's assertions, *PPG* does not bar EPEC's claim based upon a theory of owner/operator liability.

In fact, the cases cited by Plaintiff demonstrate that, although the facts in the case at bar are unique, designation of the NL Facility as the "the facility" for purposes of EPEC's § 9607(a) claim is legally sound. In *Beazer*, the Court found that the designation of the *source* of the

9

pollution on the defendant's land as the operative "facility," although there were areas of the plaintiff's property which could be considered "facilities," was irrelevant because the defendant "had control of the hazardous substances at the time of release." *Louisiana-Pac. Corp. v. Beazer Materials & Servs., Inc.*, 811 F. Supp. 1421, 1431 (E.D. Cal. 1993). Therefore, the plaintiff's designation of the "facility" as the location of the substances at the time of release was appropriate. The fact that the plaintiff in *Beazer* might have aggravated the problem by further spreading the hazardous substances originally released by the defendant would only impact the "issue of damages [and was] irrelevant for purposes of liability." *Id.*

Another case cited by Plaintiff, *NutraSweet*, further supports the conclusion that EPEC's designation of the NL Site as the NL Facility is appropriate. *See NutraSweet Co. v. X-L Eng'g Corp.*, 933 F. Supp. 1409, 1418 (N.D. Ill. 1996), *aff'd*, 227 F.3d 776 (7th Cir. 2000). In *Nutrasweet*, the Court concluded that both the plaintiff's and the defendant's lands, which adjoined each other, could be considered "facilities" for purposes of owner-operator liability.[1] *Id.* at 1417-19.   The Court adopts this reasoning. Although the EPEC Site may arguably be considered a "facility" as well, that fact does not require dismissal of Plaintiff's owner/operator theory.

Finally, the fact that the sites at issue in this case are not adjacent in the same sense as they were in *Nutrasweet* and *Beazer* is a distinction without a difference.[2] It can plausibly be

---

[1] The fact that the *Nutrasweet* court did not hold the defendant liable as an owner or operator, due to the fact that the defendant did not own or operate the facility, does not affect this conclusion because the inquiry at this juncture of this case asks only whether the designation of the NL Site as a facility is a proper basis for an eventual/possible finding of liability. *Nutrasweet* clearly indicates that it is.

[2] Defendant's citation to *United States v. Davis*, 31 F. Supp. 2d 45 (D.R.I. 1998) does not change the Court's conclusion. The *Davis* court was correct to conclude therein that arranger liability was the only appropriate theory to hold the defendants located in New Jersey liable under CERCLA. The Court, however, does not agree with Defendant that accepting that NL may be liable under

argued that they are functionally adjacent due to the fact that they share a common border on the Raritan River. Moreover, taking the facts in the Complaint as true, and keeping in mind the strict liability nature of CERCLA, the fact that a third-party in the form of the Army Corps may have removed the Radiological Materials from the riverbed and onto the EPEC site is irrelevant. NL is strictly liable for damages that result from the discharge of the Radiological Materials into the river. The fact those materials were transported slightly further than NL may have anticipated when they allegedly discharged them into the Raritan River, due to strict liability, does not effect that analysis. Just as the flow of water due to gravity or erosion can transfer hazardous material from a facility onto adjacent land, *see Nutrasweet* and *Beazer,* so too can the actions of a third-party.

### b)      Arranger Liability

In addition to the alleged infirmities of Plaintiff's owner/operator claim, Defendant contends that Plaintiff's arranger claim pursuant to § 9607(a)(3) fails to state a cause of action. (Def.'s Br. 14.) The Court disagrees.

CERCLA defines an arranger as:

> any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances . . . .

---

owner/operator liability in this case would "negate the 'arranger' section" in CERCLA and that "any entity that generated waste containing hazardous substances would be liable as an owner/operator wherever the waste came to be located . . . in the United States . . . ." (Def.'s Reply 5.) The facts in *Davis* are simply too dissimilar from the present case. Here, the NL Site and the EPEC site are several orders of magnitude more proximate than the distance between the hazardous waste producers in *Davis* and the landfill in Rhode Island to which their waste was transported. Defendant, according to the Complaint, discharged waste from the NL Facility into the Raritan River that was then transported to the opposite river bank by the Army Corps. As noted earlier, this factual scenario is unique, but not similar enough to *Davis* that the Court finds that owner/operator liability may not be appropriate.

42 U.S.C. § 9607(a)(3).

In addition to properly alleging that NL is a PRP as an arranger, Plaintiff must also allege the additional § 9607 elements listed above: that hazardous substances were disposed of at a 'facility'; that there has been a "release" or "threatened" release of hazardous substances from the facility into the environment; and that the release or threatened release has required or will require the plaintiff to incur "response costs." *PPG*, 197 F.3d at 103-04. In the instant motion, Defendant limits its challenge to whether Plaintiff has properly alleged facts which may support arranger liability and does not address the additional elements. (*See* Def.'s Br. 14-22.)

The Third Circuit has laid out a comprehensive analytical framework to determine whether a defendant qualifies as an arranger. *See Morton Int'l, Inc. v. A.E. Staley Mfg. Co.*, 343 F.3d 669, 676-80 (3d Cir. 2003). The *Morton* court noted that "Congress did not define the term 'arranged for' in the statute" and was therefore compelled to begin its analysis with the plain language of the statute. *Id.* at 676. After determining that "the dictionary definition of arrange does not shed much light on the proper scope of liability under this section," the *Morton* court found that Congress' decision to include the phrase "'or otherwise' after 'by contract [or] agreement,' . . . expanded the means by which a party could possibly 'arrange for' the treatment or disposal of hazardous substances in defining this category of PRP." *Id.* As such, arranger liability is to be "broadly construed" in order to be "consistent with Congress'[] overall purpose in enacting CERCLA." *Id.* Only through a broadly read scheme of arranger liability could Congress hold "those actually responsible for any damage, environmental harm, or injury from chemical poisons [for] the cost of their actions." *Id.* (internal quotation marks omitted; citation omitted).

The *Morton* court first noted two main concepts that it felt that the Courts of Appeals were in agreement with before delving more deeply into the factors. "First, the determination of

'arranger liability' is a fact-sensitive inquiry that requires a multi-factor analysis." *Id.* at 677. "Second, courts must look beyond the defendant's characterization of the transaction at issue in order to determine whether the transaction, in fact, involves an arrangement for the disposal or treatment of a hazardous substance." *Id.* With those guideposts in mind, the court held that "the most important factors in determining 'arranger liability' are: (1) ownership or possession; and (2) knowledge; or (3) control." *Id.*[3]

Although "[o]wnership or possession of the hazardous substance must be demonstrated, [that] factor alone will not suffice to establish liability." *Id.* Rather, a "plaintiff must *also* demonstrate *either* control over the process that results in a release of hazardous waste *or* knowledge that such a release will occur during the process." *Id.* (first emphasis added).

Regarding *ownership*, the court held that "proof of ownership, or at least possession, of the hazardous substance is required by the plain language of the statute." *Id.* at 678. Speaking to the *knowledge* requirement, the court held that "proof of a defendant's knowledge that hazardous waste can or will be released in the course of the process it has arranged for, provides a good reason to hold a defendant responsible because such proof demonstrates that the defendant knowingly (if not personally) contributed to the hazardous-waste contamination." *Id.* To that end, "general knowledge that waste disposal is an inherent or inevitable part of the process arranged for by the defendant may suffice to establish liability." *Id.* (citing *United States v. Aceto Agr. Chems. Corp.*, 872 F.2d 1373, 1384 (8th Cir. 1989)). This factor can be met, at the motion to dismiss stage, by alleging facts which would prove "either *actual knowledge* (e.g., a provision in an agreement estimating the amount of environmentally harmful spillage inherent in the processing of the defendant's materials), or *presumed knowledge* (e.g., the defendant is familiar

_____

[3] The *Morton* court was also quick to acknowledge that additional factors may be appropriate in certain cases and cited various courts for those factors. *Id.* n.5.

with industry custom, which is that the processing of the particular material normally results in the release of harmful wastes)." *Id.* (citing *United States v. Cello-Foil Prods., Inc.*, 100 F.3d 1227, 1231 (6th Cir. 1996); *S. Florida Water Mgmt. Dist. v. Montalvo*, 84 F.3d 402, 409 (11th Cir. 1996)). In order to allege proof of *control*, the plaintiff must plead that the "defendant had control over the process [sufficient to] establish that the defendant was responsible for the resulting release of hazardous wastes." *Id.* at 679.

In sum, a "plaintiff is required to demonstrate ownership or possession, but liability cannot be imposed on that basis alone. A plaintiff is also required to demonstrate either knowledge or control." *Id.*

### A)      The Parties' Positions

NL argues that Plaintiff has failed to plead facts that allege a *prima facie* case of arranger liability. (Def.'s Br. 14.) First, Defendant argues that Plaintiff has failed to allege that it entered into any "contract, agreement or arrangement with the Army Corps" regarding the dredge spoils deposited on the EPEC Site. (*Id.* at 15.) NL further argues that, even if an agreement existed between it and the Army Corps, the intent of the agreement was not disposal of waste generated by NL. Rather, the agreement only intended to deepen and widen the Raritan River to aid in ship navigation. (*Id.* at 16-17.)

Second, NL argues that it lacked ownership, knowledge or control over the contaminated dredge spoils. Regarding ownership, NL argues that "[n]othing in the complaint suggests that NL had an ownership interest in the dredge spoils placed on the EPEC Site by the Army Corps." (*Id.* at 19.) NL further states that EPEC failed to plead any facts that "suggest that NL had any knowledge that the Raritan River sediments dredged by the Army Corps" contained hazardous substances derived from NL's operations and that the dredge spoils would be deposited on the EPEC Site. (*Id.* at 20.) NL denies that the Complaint contains facts which sufficiently allege

14

either actual or presumed knowledge. (*Id.*) Finally, NL contends the Complaint is devoid of facts which suggest "that NL had any control over the placement of dredge spoils at the EPEC Site." (*Id.* at 21.)

EPEC, unsurprisingly, disputes NL's arguments and especially NL's focus on the dredge spoils, which it deems a "red herring." (Pl.'s Opp'n 15.) Rather, EPEC argues that its "claims are *not* about the *dredge spoils*, but rather are about the *Radiological Materials*. EPEC has alleged that NL arranged for the disposal of its *Radiological Materials* by discharging its waste material directly in the Raritan River." (*Id.* at 15.) Because of the strict liability nature of CERCLA, EPEC maintains that NL "is liable for all response costs incurred in connection with the" Radiological Materials because NL is responsible for the impact of its discharge of the waste "regardless of where the hazardous substances ultimately came to be located." (*Id.*) Plaintiff also disputes NL's argument that a third party is required in order to find arranger liability. (*Id.* at 17.) Regarding intent, Plaintiff alleges that it has properly alleged that Defendant has the requisite intent to dispose of the Radiological Materials and that Defendant's focus on the dredge spoils is, as noted above, irrelevant. (*Id.* at 21.) Finally, Plaintiff alleges that Defendant had the requisite ownership interest in the Radiological Materials when it discharged the waste into the river, knowledge that such discharge was occurring and control over the process by which the discharge was occurring. (*Id.* at 22-23.)

### B) Discussion

Initially, and virtually dispositive of all of the following analysis, the Court notes its agreement with Plaintiff that the focus of this case is the discharge of the Radiological Materials, not the eventual placement of the dredge spoils upon the EPEC Site. Due to CERCLA's strict liability nature, and the broad interpretation of arranger liability in this Circuit, adoption of Defendant's focus on the interactions between NL and its predecessors and the Army Corps is not

appropriate. *See PPG*, 197 F.3d at 104 (citing *United States v. Alcan Aluminum Corp.*, 964 F.2d 252, 266 (3d Cir. 1992) ("In order to prove a case where a CERCLA plaintiff asserts that a PRP has 'arranged' for the transportation or disposal of hazardous substances," Third Circuit "case law is clear that such a plaintiff 'must simply prove that the defendant's hazardous substances were deposited at the site from which there was a release and that the release caused the incurrence of response costs.'"); *see also Carson Harbor Vill., Ltd. v. Unocal Corp.*, 287 F. Supp. 2d 1118, 1186 (C.D. Cal. 2003) ("In the case of an actual release, the plaintiff need only prove that the defendant's hazardous materials were deposited at the site, that there was a release at the site, and that the release caused it to incur response costs."), *aff'd sub nom.*, *Carson Harbor Vill., Ltd. v. Cnty. of Los Angeles*, 433 F.3d 1260 (9th Cir. 2006).

### 1)   Arranger Liability Does Not Require a Transaction with a Third-Party

NL maintains that it cannot be found liable under arranger liability because it never entered into a transaction with the Army Corps to have the Radiological Materials removed from the riverbed onto the EPEC Site. (Def.'s Br. 15-16.) This argument fails in one important respect: Plaintiff is not required to allege such a transaction. Both the language of § 9607(a)(3) and case law dictate the conclusion.

Section 9607(a)(3) clearly indicates that "any person who by contract, agreement, *or otherwise* arranged for disposal or treatment" of a hazardous substance can be deemed an arranger. Moreover, and as noted earlier, "by including 'or otherwise' after 'by contract [or] agreement,' Congress expanded the means by which a party could possibly 'arrange for' the treatment or disposal of hazardous substances in defining this category of PRP." *Morton*, 343 F.3d at 676. By doing so, the *Morton* court concluded that "this expansive list of means indicates that Congress intended this category of PRP to be broadly construed." *Id.*

Speaking directly to the issue at hand, the Ninth Circuit stated that "allowing a generator of hazardous substances [to] potentially . . . avoid liability by disposing of wastes without involving a transporter as an intermediary" would "leave a gaping and illogical hole in [CERCLA's] coverage, permitting argument that generators of hazardous waste might freely dispose of it themselves and stay outside the statute's cleanup liability provisions." *Pakootas v. Teck Cominco Metals, Ltd.*, 452 F.3d 1066, 1081 (9th Cir. 2006); *see also Nat'l R.R. Passenger Corp. v. New York City Hous. Auth.*, 819 F. Supp. 1271, 1276-77 (S.D.N.Y. 1993); *State of Colo. v. Idarado Min. Co.*, 707 F. Supp. 1227, 1241 (D. Colo. 1989), *amended*, 735 F. Supp. 368 (D. Colo. 1990), *rev'd on other grounds*, 916 F.2d 1486 (10th Cir. 1990). Defendant contends these cases are factually distinguishable because of the manner in which the facilities were defined in those cases. (Def.'s Reply 7.) Simply stated, Defendant has produced no precedent which supports its contention that arranger "liability does not continue when a third-party subsequently moves the waste as part of an independent arrangement not involving the alleged arranger." (*Id.*) As such, and considering CERCLA's broadly remedial nature and strict liability underpinnings, the Court declines to follow Defendant's approach and will not distinguish away the above-cited cases.

### 2) Plaintiff has Alleged Defendant Acted with the Requisite Intent

In addition to its argument regarding the lack of a "transaction" with the Army Corps, NL alleges that EPEC has failed to plead that NL intended to have the Radiological Materials disposed of, moved to, or otherwise placed upon the Central Wetlands. (Def.'s Br. 16-17.) EPEC replies that the only issue to which intent must be proven is "NL's intentional disposal of the *Radiological Materials* directly into the Raritan River, not the placement of the spoils on the

17

EPEC Property." (Pl.'s Opp'n 21-22.) Both Parties cite to *Burlington N. & Santa Fe Ry. Co. v. United States*, 556 U.S. 599 (2009), to support their arguments.

As noted by the *Burlington* court, "the word 'arrange' implies action directed to a specific purpose." *Id.* at 611. "Consequently, under the plain language of the statute, an entity may qualify as an arranger under § 9607(a)(3) when it takes intentional steps to dispose of a hazardous substance." *Id.* As explained earlier, the Court views the relevant action that NL allegedly undertook with a specific purpose as the discharge of waste into the Raritan River. The fact that NL may not have intended, or take intentional steps, to have the Army Corps move the Radiological Waste onto the Central Wetlands is of no moment. Plaintiff has pled the requisite intent.

### 3) Plaintiff has Adequately Alleged that Defendant Owned the Radiological Materials and Acted with the Required Knowledge and Control

The Parties dispute what "materials" should drive this part of the Court's analysis. Defendant contends that the dredge spoils are the relevant subject matter. (Def.'s Br. 18.) Plaintiff disagrees and argues that the Radiological Materials, and Defendant's action discharging them into the Raritan River, should be the nexus of the Court's analysis. (Pl.'s Opp'n 23.) Again, as noted earlier, the Court has concluded that Plaintiff has the stronger argument. This distinction virtually forecloses consideration of Defendant's arguments and the Court will dispose of them as succinctly as possible.

Regarding ownership, Plaintiff has clearly alleged that NL both owned and possessed the Radiological Materials as they were being discharged into the Raritan River between 1935 and 1947. (Compl. ¶¶ 14-38.) The Complaint also clearly alleges that NL had the requisite knowledge—actual knowledge that the discharge was occurring and presumed knowledge that its discharge could result in a release—and control over the discharge process. (*Id.* ¶¶ 30-39.)

18

Because the operative event by which NL arranged for the disposal of its waste was the discharge of the Radiological Materials into the Raritan River, no further analysis is required. Plaintiff's § 9607 claim alleging arranger liability states a *prima facie* cause of action.

### 3)   42 U.S.C. 9613(f) — Plaintiff's  Contribution Claim

Count four of Plaintiff's complaint alleges a cause of action for contribution pursuant to CERCLA, 42 U.S.C. § 9613(f). Defendant argues that this cause of action is improper at this point in time because Plaintiff has not been "sued under CERCLA or . . . otherwise resolved its liability through an administrative or judicially approved settlement." (Def.'s Br. 8.) Defendant is correct. The Supreme Court, in two cases, has made clear that "a private party [can] seek contribution under [§ 9613(f)] only after being sued under [§ 9606] or [§ 9607(a)]." *United States v. Atl. Research Corp.*, 551 U.S. 128 (2007) (citing *Cooper Indus., Inc. v. Aviall Serv., Inc.*, 543 U.S. 157, 161 (2003). Because Plaintiff has failed to allege that it has been sued pursuant to § 9607, or otherwise settled claims brought pursuant thereto, its claim for contribution is therefore DISMISSED with prejudice. *See NL Indus., Inc. v. Halliburton Co.*, No. 10-89A, 2010 WL 4340938, at *4 (W.D.N.Y. Nov. 2, 2010) ("[N]o one has sued plaintiff and imposed some sort of percentage of liability on it that it could try to alter through a contribution claim. As a result, although plaintiff might have a contribution claim against Halliburton in the future, any attempt to seek contribution now is premature.").

### 4)   42 U.S.C. § 9613(g)(2) — Plaintiff's Declaratory Judgment Claim

The fifth count of the Complaint  seeks a declaratory judgment that Defendant is liable for all "further response costs or damages" pursuant to § 9607(a) and § 9613(f). Defendant seeks dismissal of this claim on the assumed basis that both Plaintiff's § 9607(a) and § 9613(f) claims must be dismissed. (Def.'s Br. 23.) Because, as noted above, Plaintiff has stated a viable claim as

to § 9607(a), Plaintiff's declaratory judgment claim pursuant to § 9613(g)(2) survives Defendant's Motion to Dismiss.

### 5)   Plaintiff's Common Law Trespass Claim

Count one of the Complaint alleges common law trespass. (Compl. ¶¶ 92-99.) Defendant contends that the claim is legally barred for two reasons: 1) "New Jersey courts have repeatedly rejected trespass claims arising from the voluntary acceptance of allegedly contaminated fill material," and 2) the fact that Plaintiff may not have known the dredge spoils contained the Radiological Materials does not support a claim of trespass. (Def.'s Br. 24-25.) Plaintiff contends that New Jersey case law does not bar trespass claims related to hazardous waste and that EPEC's predecessor did not consent to the disposal of the Radiological Materials on the Central Wetlands. Rather, Plaintiff contends Heyden only consented to the placement of dredge spoils it otherwise thought were benign. (Pl.'s Opp'n 25-27.)

"Trespass constitutes the unauthorized entry (usually of tangible matter) onto the property of another." *New Jersey Tpk. Auth. v. PPG Indus., Inc.*, 16 F. Supp. 2d 460, 478 (D.N.J. 1998), *aff'd*, 197 F.3d 96 (3d Cir. 1999). The Parties have each cited cases which they believe support their relative positions that a trespass claim, based upon the facts in the Complaint, is, or is not, currently permitted under New Jersey law. An extended discussion of those cases is not required because the Court finds reference to a recent case persuasive and adopts its reasoning in whole.

In *Woodcliff*, the Hon. Joel A. Pisano, U.S.D.J., held on facts extremely similar to the ones presented here, that "use of trespass liability" is an "'inappropriate theory of liability' and an 'endeavor to torture old remedies to fit factual patterns not contemplated when those remedies were fashioned.'" *Woodcliff, Inc. v. Jersey Const., Inc.*, 2012 WL 3822139, at *3, --- F. Supp. 2d ---- (D.N.J. 2012) (citing *New Jersey Turnpike. Auth.*, 16 F. Supp. 2d at 478 (D.N.J. 1998); *Preferred Real Estate Invs., Inc. v. Edgewood Props., Inc.*, 2007 WL 81881 (D.N.J. Jan 09,

2007)). Pursuant to the reasoning in *Woodcliff*, the Court DISMISSES Plaintiff's common law trespass claim with prejudice.

### 6)   Plaintiff's Common Law Private Nuisance Claim

The Second Count of EPEC's Complaint alleges a common law private nuisance claim. "Under New Jersey law, 'the essence of a private nuisance is an unreasonable interference with the use and enjoyment of land.'" *Rowe v. E.I. Dupont De Nemours & Co.*, 262 F.R.D. 451, 459 (D.N.J. 2009) (quoting *Sans v. Ramsey Golf and Country Club, Inc.*, 29 N.J. 438, 448 (1959)). In order to be successful, a Plaintiff "must show that 'there has been an unreasonable, unwarranted or unlawful use by a person of his real property which is resulting in a material annoyance, inconvenience or hurt.'" *Id.* (quoting *State, Dept. Of Envtl Prot. v. Exxon Corp.,* 151 N.J. Super. 464, 482-83 (Ch. Div. 1977)). As the *Rowe* court noted, "'New Jersey courts have moved toward a strict liability theory with respect to environmental pollution cases and away from such common law claims as trespass and nuisance.'" *Id.* at 458-59 (quoting *Borough of Rockaway v. Klockner & Klockner*, 811 F. Supp. 1039, 1053 (D.N.J. 1993)). "[T]here are two elements to a private nuisance claim: 1) unreasonable use by the defendant and 2) significant harm to the plaintiff." *Id.* at 459.

Defendant contends and Plaintiff concedes, however, that there can be additional elements to a private nuisance cause of action, proximity and contemporaneousness. (Def.'s Br. 26; Pl.'s Opp'n 30.) Plaintiff refutes the *relevance* of these elements to this case. (Pl.'s Opp'n 30.) The Court agrees with Plaintiff: as stated in *Rowe*, "the 'neighboring or adjoining' requirement [exists] for a different reason: a nuisance claim requires a contemporaneous relationship between the plaintiff and defendant. In other words, a *successor* landowner cannot assert a nuisance claim against a *predecessor* landowner because the nuisance property and the affected property are one

21

and the same." *Rowe*, 262 F.R.D. at 459-60 (emphasis added) (citing *T & E Indus., Inc. v. Safety Light Corp.*, 123 N.J. 371, 385 (1991).

The additional cases cited by Defendant speak to the same predecessor/successor dynamic. *See T & E Indus.*, 123 N.J. at 385 ("Historically, private-nuisance law resolved disputes between neighboring property owners over contemporaneous land uses" and therefore "did not cover conditions existing on the very land transferred" and a "successor in title could not ground its claim on a private-nuisance theory."); *Philadelphia Elec. Co. v. Hercules, Inc.*, 762 F.2d 303, 314 (3d Cir. 1985) ("nuisance law can be seen as a complement to zoning regulations . . . and not as an additional type of consumer protection for purchasers of realty"). Although the concept of private nuisance is becoming disfavored in New Jersey courts for contamination actions, it has not yet been abandoned and Plaintiff has pled a *prima facie* claim.

### 7)   Plaintiff's Common Law Indemnification Claim

Plaintiff's common law indemnification claim is dismissed for failure to state a cause of action. "Common-law indemnity [is] an equitable doctrine that allows a court to shift the cost from one tortfeaser to another." *Promaulayko v. Johns Manville Sales Corp.*, 116 N.J. 505, 511 (1989). "Two different situations can give rise to indemnification: either when a contract expressly provides for it, or when a special legal relationship creates an implied right of indemnity." *Ferriola v. Stanley Fastening Sys., L.P.*, No. 04-4043 (JEI), 2007 WL 2261564, at *2 (D.N.J. Aug. 1, 2007). Here, Plaintiff has not alleged the existence of a contract. "As for the special relationship requirement, while 'the case law is not exhaustive, examples of special relationships are: principal-agent, employer-employee, lessor-lessee, and bailor-bailee.'" *SGS U.S. Testing Co., Inc. v. Takata Corp.*, No. 09-6007 (DMC), 2012 WL 3018262, at *4 (D.N.J. July 24, 2012) (citation omitted).

22

Plaintiff argues that a "special legal relationship" exists here because courts have found such a relationships under a "breadth of circumstances." (Pl.'s Opp'n 34.) In fact, Plaintiff alleges that courts in this district have "consistently recognized that the requisite special relationship can result from the 'wrongdoer's failure to discover or correct a defect or remedy a dangerous condition.'" (*Id.*) (citing *Smith v. Lindemann*, No. 10-3319 (FSH), 2011 WL 3235682, at *1 n.4 (D.N.J. July 28, 2011). The expansive reading that Plaintiff advocates has been curtailed by some courts. *See Takata*, 2012 WL 3018262, at *5 ("[I]mplied indemnification by way of a special relationship is a 'narrow doctrine' that is not frequently stretched beyond the examples of principal-agent, employer-employee, lessor-lessee, and bailor-bailee.").

Here, the Court finds that, based upon the facts alleged by Plaintiff, a special relationship does not exist. The alleged relationship between Plaintiff and Defendant is not of the type typically used to support common law indemnification and the Court does not find any reason to apply *Lindemann's* categories of special relationships to the facts presented here. The Parties are simply too tangentially related for the Court to exercise its equitable powers and impose indemnification constructively. The Court, however, only DISMISSES this claim without prejudice and grants Plaintiff leave to amend this claim to allege facts which may support the existence of a special relationship.

## IV.   <u>Conclusion</u>

For the reasons set forth above, and other good cause shown, it is hereby ordered that Defendant's Motion to Dismiss is GRANTED in part and DENIED in part. Count One, common law trespass, is DISMISSED with prejudice. Count Two, common law private nuisance, states a *prima facie* cause of action. Count Three, CERCLA cost recovery pursuant to 42 U.S.C. § 9607(a) based upon both owner/operator and arranger liability, states a *prima facie* cause of action. Count Four, CERCLA contribution pursuant to 42 U.S.C. § 9613(f), is DISMISSED with

prejudice. Count Five, CERCLA declaratory judgment pursuant to 42 U.S.C. § 9613(g)(2) states a *prima facie* cause of action. Count Ten, Common Law Indemnification is DISMISSED without prejudice. Plaintiff is instructed to submit an Amended Complaint removing the counts dismissed with prejudice by June 7, 2013. As indicated above, the Amended Complaint may contain an amended claim for common law indemnification.

　　　　　　　　　　　　　　　　　　　　s/ Michael A. Shipp
　　　　　　　　　　　　　　　　　　MICHAEL A. SHIPP
　　　　　　　　　　　　　　　　　　UNITED STATES DISTRICT JUDGE

Dated: May 24th, 2013