BRESSLER, AMERY & ROSS
A Professional Corporation
325 Columbia Turnpike
Florham Park, New Jersey 07932
P.O. Box 1980
Morristown, New Jersey 07962
(973) 514-1200
Attorneys for Plaintiff EPEC Polymers, Inc.

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
Trenton Vicinage**

| | |
|---|---|
| EPEC POLYMERS, INC.,<br><br>                              Plaintiff,<br><br>v.<br><br>NL INDUSTRIES, INC. and UNITED STATES ARMY CORPS OF ENGINEERS,<br><br>                            Defendants. | Civil Action No. 3:12-cv-03842-MAS-TJB<br><br>Civil Action<br><br>**SECOND AMENDED COMPLAINT AND JURY DEMAND** |

      Pursuant to the March 15, 2018 Text Order executed by the Hon. Tonianne J. Bongiovanni, U.S.M.J., Plaintiff EPEC Polymers, Inc. ("EPEC"), by and through its attorneys, Bressler, Amery & Ross, P.C., hereby files this Second Amended Complaint against Defendant NL Industries, Inc. ("NL Industries") and Defendant United States Army Corps of Engineers (the "Army Corps") (collectively, "Defendants") and says:

**PARTIES**

      1.      EPEC is a Delaware corporation with its principal place of business located at 1001 Louisiana Street, Houston, Texas.

      2.      NL Industries is a New Jersey corporation with its principal place of business located at 5430 L.B.J. Freeway, Suite 1700, Dallas, Texas.

3. The Army Corps is an agency of the United States government headquartered at 441 G Street, NW, Washington, D.C. 20314.

## JURISDICTION AND VENUE

1. This Court has original jurisdiction under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9613(b) and 42 U.S.C. § 9620(a).

2. Venue is properly laid in this Judicial District pursuant to 42 U.S.C. § 9613(b) because the release and/or discharge of hazardous substances at issue occurred in this district. In addition, venue is properly laid in this Judicial District pursuant to 28 U.S.C. § 1391 because the events giving rise to the cause of action arose in this district and the subject property lies in this district. Specifically, the hazardous substances released and/or discharged by NL Industries and/or its predecessors, to whose liabilities NL Industries has expressly or impliedly succeeded, including, but not limited to, National Lead Company and the Titanium Pigment Company (collectively, "NL") came to be located at the EPEC Property (as defined below), which is located in the Fords and Keasbey sections of Woodbridge Township, Middlesex County, New Jersey, north of the Raritan River.

## FACTUAL BACKGROUND

3. EPEC is the owner of certain real property located on Riverside Drive, also known as Industrial Avenue, in the Fords section of Woodbridge Township, Middlesex County, New Jersey and identified as Lots 2 and 3 of Block 62, and Lot 100 of Block 93, on the Tax Map of the Township of Woodbridge (the "EPEC Property"). Predecessors of EPEC that previously operated at the EPEC Property included Heyden Chemical Corporation ("Heyden"), Heyden-Newport Corporation, and Tenneco Chemical Company.

4. The EPEC Property is situated along the northern shore of the Raritan River in an industrial section of the Township of Woodbridge.

5. The EPEC Property covers approximately 185 acres and currently comprises formerly-developed upland areas, undeveloped upland areas, wetlands, open waters, and tidal marsh adjacent to the Raritan River.

6. The southern two-thirds of the EPEC Property is a vegetated wetlands area.

7. The wetlands are subdivided into the Central Wetlands and the Southern Wetlands.

8. The Central and Southern wetlands are separated by berms created by the Army Corps prior to the placement of dredge spoils on the EPEC Property.

9. The Central Wetlands covers approximately 45 acres.

10. Located directly across the Raritan River from the EPEC Property is real property formerly owned by NL, located on Chevalier Avenue, Sayreville, Middlesex County, New Jersey (the "NL Property").

## THE NL FACILITY AND OPERATIONS

11. NL conducted manufacturing operations at a facility located on the NL Property (the "NL Facility") from approximately 1935 until 1982.

12. NL manufactured, among other things, paint that was marketed under the Dutch Boy label.

13. NL used titanium dioxide paint pigments in its paint manufacturing operations.

14. The NL Facility was established in 1935 as a titanium dioxide processing plant.

15. The process employed by NL at the NL Facility in the processing of titanium dioxide required significant quantities of raw materials, specifically ilmenite ore and sulfuric acid.

16. To obtain titanium for use in its manufacture of titanium dioxide, NL extracted titanium from ilmenite.

17. Prior to 1942, NL's primary source of ilmenite ore was a deposit of beach sands located in the Travancore province of India.

18. Prior to 1942, the United States imported more than 95 percent of its ilmenite ore from India.

19. Approximately 44,112 tons of ilmenite ore were delivered to the NL Facility in 1938.

20. Approximately 58,318 tons of ilmenite ore were delivered to the NL Facility in 1940.

21. NL contracted to receive 47 percent of all ilmenite ore imported from India in 1941, which totaled approximately 140,000 tons.

22. The ilmenite ore obtained by NL from India contained naturally-occurring radiological materials, including thorium, uranium, and radium (the "Radiological Materials").

23. NL's manufacture of titanium dioxide at the NL Facility removed the thorium and other Radiological Materials from the ilmenite ore.

24. Upon information and belief, NL removed the Radiological Materials with the use of concentrated sulfuric acid.

25. Upon information and belief, NL then dissolved the mixture in water to remove the ferrous sulfate and sulfuric acid.

26. Upon information and belief, NL then calcinated the product to produce titanium dioxide.

27. Waste materials associated with NL's manufacture of titanium dioxide included the Radiological Materials.

## DISPOSAL OF WASTE FROM THE NL FACILITY

28. From in or around 1935 until in or around 1947, NL discharged liquid waste, including the waste materials associated with its manufacture of titanium dioxide, directly into the Raritan River.

29. The liquid waste that was discharged by NL into the Raritan River contained Radiological Materials, including thorium.

30. During this period, NL discharged more than 3,000 tons of liquid waste per day from the NL Facility directly into the Raritan River.

31. The New Jersey Department of Health ("NJDOH") issued a notice to NL on or about October 13, 1942 requiring it to cease discharging waste from the NL Facility into the Raritan River by January 14, 1943.

32. NL failed to comply with the NJDOH's notice and cease discharges of waste to the Raritan River.

33. The NJDOH referred the issue to the New Jersey Office of the Attorney General in 1945 for initiation of legal action against NL regarding its discharge of waste from the NL Facility into the Raritan River.

34. NL subsequently notified the NJDOH that the company had developed and approved a plan to barge the wastes from the NL Facility to the Atlantic Ocean for disposal.

35. NL began implementing the ocean disposal program in or about the fall of 1947.

36. From in or around 1935 until approximately the fall of 1947, NL discharged millions of tons of liquid waste containing Radiological Materials directly into the Raritan River.

37. As a result of these discharges, the Radiological Materials came to be located in the Raritan River sediments.

## DREDGING OF THE RARITAN RIVER

38. The Army Corps has historically conducted and/or coordinated authorized dredging of the sediments of the Raritan River.

39. The Army Corps conducted several dredging projects in the Raritan River, including portions of the Main and South channels of the river.

40. The South Channel was located immediately adjacent to the NL Facility.

41. The Congressional River and Harbor Act of March 1881 authorized the initial South Channel dredging project, which provided for a channel 5.5 feet deep, 100 feet wide, and 2.5 miles long from the future location of the NL Facility upstream to Crab Island.

42. Subsequently, the River and Harbor Act of March 1919 called for the dredging of a channel, ten (10) feet deep at mean low water, 150 feet wide, and about three (3) miles long, located on the southerly side of the river, about four (4) miles above its mouth, extending from Crab Island to Kearney's Dock, the future home of the NL Facility.

43. This dredging project was completed in 1921.

44. As set forth above, NL commenced operations at the NL Facility in or about 1935.

45. By March 1935, NL had constructed a 500-foot-long wharf on the NL Property.

46. NL dredged the berthing space for the wharf to a depth of nineteen (19) feet.

47. The South Channel downstream of the NL Facility, however, was only dredged to a depth of fourteen (14) feet.

48. NL urged the Army Corps in 1934 to undertake additional dredging to widen and deepen the South Channel.

49. In 1935, the Army Corps recommended additional dredging of the South Channel so that larger-draft vessels could reach the NL Facility from Raritan Bay.

50. The United States Congress subsequently passed the 1937 River and Harbor Act, which authorized the Army Corps to provide a channel twenty-five (25) feet deep and 200 feet wide up the South Channel to the upper limit of the NL Facility.

51. The width of the approved South Channel dredging project was increased to 300 feet on October 17, 1940 through the passage of the National Defense River and Harbor Act.

52. In or around 1939-1940, the Army Corps approached the owners of properties along the Raritan River to secure locations for the deposition of dredge spoils that would be generated from the South Channel dredging project.

53. Among the property owners approached by the Army Corps was EPEC's predecessor, Heyden, which operated a facility on the northern third of the EPEC Property.

54. The Army Corps and Heyden entered into an agreement in February 1940 for the placement of dredge spoils on the Central Wetlands portion of the EPEC Property.

55. Dredging of the South Channel began in the vicinity of the Thomas Edison Bridge in December 1940.

56. The Army Corps used a hydraulic dredging technique to perform the dredging of the South Channel.

57. The hydraulic dredging technique entails pumping dredged materials from a hopper barge directly onto the nearby shoreline for use as fill.

58. Use of the hydraulic method required the Army Corps to construct embankments/bulwarks on the shore to contain the dredge spoils.

59. Prior to placement of the dredge spoils on the EPEC Property, the Army Corps constructed a berm separating the Central Wetlands from the Southern Wetlands.

60. Aerial photography indicates that the embankments/bulwarks and berms were constructed on the Central Wetlands portion of the EPEC Property between 1943 and 1947.

61. From approximately 1943 to 1947, dredge spoils removed from the Raritan River during the South Channel dredging project were placed on the Central Wetlands portion of the EPEC Property.

62. The dredge spoils placed on the Central Wetlands portion of the EPEC Property consisted of sediments dredged from the South Channel of the Raritan River.

## RADIOLOGICAL CONTAMINATION AT THE EPEC PROPERTY

63. In April 2009, EPEC performed a gamma surface survey at the EPEC Property including certain areas within the Central Wetlands.

64. The investigation detected the presence of elevated levels of thorium in the soils.

65. Thorium was never produced, generated and/or used at the EPEC Property.

66. Upon information and belief, there were no manufacturing operations historically located on the north shore of the Raritan River that used thorium in their manufacturing processes.

67. As set forth above, NL discharged waste materials containing Radiological Materials, including thorium, from the production of titanium dioxide directly into the Raritan River.

68. Subsequent investigations at the EPEC Property within the Central Wetlands have revealed elevated levels of thorium and the other Radiological Materials in the Central Wetlands (the "Radiological Contamination").

69. The source of the thorium and the other Radiological Materials in the Central Wetlands is the dredge material taken from the Raritan River and placed on the Central Wetlands between 1943 and 1947, as discussed above.

70. The dredge spoils on the Central Wetlands are clayey in texture and contain shell fragments, which confirm their origin in the Raritan River.

71. The Radiological Contamination, including thorium, found in the Central Wetlands is co-located with the dredge spoils, indicating that the Radiological Contamination was contained within the dredge spoils when placed on the Central Wetlands between 1943 and 1947.

72. The Radiological Contamination, including thorium, found in the Central Wetlands is confined to and/or uniformly distributed throughout the horizontal extent of the clayey deposits and occur in one or more distinct layers of dredge material below the ground surface.

73. This confined and/or uniform distribution indicates that the Radiological Contamination was contained within the dredge spoils when placed on the Central Wetlands between 1943 and 1947.

74. The Radiological Contamination in the Central Wetlands portion of the EPEC Property is related solely to the dredge spoils removed from the Raritan River and placed on the Central Wetlands between 1943 and 1947.

75. The dredge spoils that were placed on the Central Wetlands portion of the EPEC Property contain Radiological Materials that were discharged from the NL Facility into the Raritan River sediments.

76. The Radiological Contamination is confined to the Central Wetlands and does not extend into other areas of the EPEC Property.

77. The Radiological Contamination in the Central Wetlands, including thorium, is not from any on-site source.

78. While limited quantities of uranyl nitrate was used in previous manufacturing of benzaldehyde at the EPEC Property, there was/is no pathway or mechanism for the limited amount of uranium used to become located in the dredge spoils containing Radiological Contamination that were placed on the Central Wetlands.

79. The limited amounts of uranyl nitrate used on-site is different from the uranium discovered in the Central Wetlands.

80. Moreover, as set forth above, the Radiological Contamination, including uranium, found in the Central Wetlands is co-located with the dredge spoils from the Raritan River placed on the Central Wetlands between 1943 and 1947.

81. EPEC has completed the investigation of the Radiological Contamination in the Central Wetlands portion of the EPEC Property, including investigative activities required by the New Jersey Department of Environmental Protection ("NJDEP").

82. To date, EPEC has incurred over $2 million in investigating the Radiological Contamination in the Central Wetlands.

83. EPEC will continue to incur significant costs related to the investigation and/or remediation of the Radiological Contamination in the Central Wetlands, including, but not limited to, the excavation, transportation, and disposal of soils and other material containing Radiological Contamination.

84. In addition, the EPEC Property has been damaged by the presence of the Radiological Contamination, including, but not limited to, damage to natural resources, such as wetlands.

85. EPEC has also suffered decreased use of the EPEC Property due to the presence of the Radiological Contamination.

86. EPEC has also incurred and will continue to incur costs and/or expenses to comply with or satisfy municipal and/or local requirements, including, but not limited to public access, as a result of the Radiological Contamination.

87. In November 2011, EPEC provided NL with notice of the Radiological Contamination in the Central Wetlands portion of the EPEC Property and the evidence linking the discharges from the NL Facility to the Radiological Contamination.

88. EPEC demanded that NL acknowledge responsibility for the Radiological Contamination, reimburse EPEC for costs of investigation and remediation that it had already incurred, and agree to assume and pay for any and all future investigative and remedial activities.

89. NL has rejected EPEC's demand and has refused to cooperate with EPEC.

## FIRST COUNT
**(Private Nuisance as to Defendant NL)**

90. EPEC repeats and re-alleges the allegations contained in Paragraphs 1 through 91 of this complaint as if fully set forth at length herein.

91. NL operated the NL Facility at the NL Property from approximately 1935 until 1982.

92. During the period of its operations, NL was obligated to make reasonable use of its property to ensure that its operations did not cause unnecessary damage or annoyance to nearby properties.

93. NL is liable for the Radiological Contamination that it discharged from the NL Facility that came to be located on the EPEC Property.

94. The presence of the Radiological Contamination on the EPEC Property caused, and continues to cause, EPEC to suffer damage and annoyance.

95. The presence of the Radiological Contamination negatively impacts the EPEC Property, including, but not limited to, adversely impacting the value of the EPEC Property.

96. NL's actions with respect to the discharge of its waste material into the Raritan River constitute a private nuisance for which EPEC is entitled to damages.

**WHEREFORE**, Plaintiff EPEC demands judgment against Defendant NL for compensatory, incidental, consequential, and punitive damages with interest and costs and expenses of suit, including reasonable attorney's fees, and for such other and further relief as the Court deems just and equitable.

### SECOND COUNT
**(CERCLA Cost Recovery Pursuant to 42 U.S.C. § 9607(a) as to Defendants NL and Army Corps)**

97. EPEC repeats and re-alleges the allegations contained in Paragraphs 1 through 98 of this complaint as if fully set forth at length herein.

98. The NL Facility is a "facility" within the meaning of 42 U.S.C. § 9601(9).

99. The EPEC Property is a "facility" within the meaning of 42 U.S.C. § 9601(9).

100. EPEC is a "person" within the meaning of 42 U.S.C. § 9601(21).

101. NL is an "owner" within the meaning of 42 U.S.C. § 9601(20).

102. NL is an "operator" within the meaning of 42 U.S.C. § 9601(20).

103. NL is liable under CERCLA as an "owner" pursuant to 42 U.S.C. §§ 9607(a)(1) and 9607(a)(2).

104. NL is liable under CERCLA as an "operator" pursuant to 42 U.S.C. §§ 9607(a)(1) and 9607(a)(2).

105. NL arranged for the disposal of hazardous substances and/or materials from the NL Facility by discharging its waste material directly into the Raritan River, which waste material came to be located at the EPEC Property, within the meaning of 42 U.S.C. § 9607(a)(3).

106. The Army Corps arranged for the disposal of hazardous substances and/or materials from the NL Facility by dredging the South Channel of the Raritan River and placing the dredge spoils containing Radiological Contamination on the Central Wetlands portion of the EPEC Property, within the meaning of 42 U.S.C. § 9607(a)(3).

107. The Army Corps transported hazardous substances and/or materials from the NL Facility by dredging the South Channel of the Raritan River and placing the dredge spoils containing Radiological Contamination on the Central Wetlands portion of the EPEC Property, within the meaning of 42 U.S.C. § 9607(a)(4).

108. The Army Corps selected the EPEC Property as a location to place dredge spoils from the Raritan River.

109. EPEC has incurred, and will continue to incur, costs of response, as that term is defined in CERCLA, in connection with the hazardous substances and/or materials discharged and/or released from the NL Facility and placed on the EPEC Property.

110. EPEC's costs of response have been incurred consistent with the National Contingency Plan.

111. Pursuant to 42 U.S.C. § 9607(a), Defendants are liable for all costs of response incurred by EPEC in connection with the investigation and/or remediation of hazardous substances and/or materials discharged and/or released from the NL Facility that came be located on the EPEC Property.

**WHEREFORE**, Plaintiff EPEC demands judgment against Defendants for any and all costs of response incurred by EPEC and for such other and further relief as the Court deems just and equitable.

### THIRD COUNT
**(Declaratory Judgment Pursuant to CERCLA, 42 U.S.C. § 9613(g)(2) as to Defendants NL and Army Corps)**

112. EPEC repeats and re-alleges the allegations contained in Paragraphs 1 through 111 of this complaint as if fully set forth at length herein.

113. As set forth above, Defendants are liable for all of EPEC's costs of response pursuant to 42 U.S.C. §§ 9607(a) and 9613(f).

114. Pursuant to 42 U.S.C. § 9613(g)(2), the Court must enter a declaratory judgment as to Defendants' liability for EPEC's response costs that will be binding in any subsequent action by EPEC to recover further response costs or damages.

**WHEREFORE**, Plaintiff EPEC requests that the Court issue a declaratory judgment that Defendants are liable for all costs of response incurred by EPEC with respect to the Radiological Contamination on the EPEC Property and that such declaratory judgment shall be binding in any subsequent action.

### FOURTH COUNT
**(Declaratory Relief as to Defendants NL and Army Corps)**

115. EPEC repeats and re-alleges the allegations contained in Paragraphs 1 through 114 of this complaint as if fully set forth at length herein.

116. In order to avoid meritless prosecution, EPEC requires a declaratory judgment against NL under the Declaratory Judgment Act, 28 U.S.C. § 2201, and the New Jersey Declaratory Judgment Act, N.J.S.A. 2A:16-50 et seq., declaring NL responsible for the investigation and

remediation of the Radiological Contamination that is located on the EPEC Property that will be binding in any subsequent action.

117.   In order to avoid meritless prosecution, EPEC requires a declaratory judgment against the Army Corps under the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring the Army Corps responsible for the investigation and remediation of the Radiological Contamination that is located on the EPEC Property that will be binding in any subsequent action.

118.   An actual, substantial, and justiciable controversy exists between EPEC and Defendants regarding their respective rights and obligations for the Radiological Contamination that is present on the EPEC Property and the costs and/or damages that have been and will be incurred by EPEC.

119.   Pursuant to 28 U.S.C. § 2201 and N.J.S.A. 2A:16-50 et seq., EPEC is entitled to a declaration from this Court that NL is liable to EPEC for the investigation and remediation of the Radiological Contamination that is located on the EPEC Property.

120.   Pursuant to 28 U.S.C. § 2201, EPEC is entitled to a declaration from this Court that the Army Corps is liable to EPEC for the investigation and remediation of the Radiological Contamination that is located on the EPEC Property.

121.   A declaratory judgment is necessary for the purpose of settling and affording relief from uncertainty with respect to Defendants' liability to EPEC.

**WHEREFORE**, Plaintiff EPEC requests that the Court issue a declaratory judgment that Defendants are responsible for the investigation and remediation of the Radiological Contamination that is located on the EPEC Property that will be binding in any subsequent action.

## FIFTH COUNT
**(New Jersey Spill Compensation and Control Act as to Defendant NL)**

122. EPEC repeats and re-alleges the allegations contained in Paragraphs 1 through 121 of this complaint as if fully set forth at length herein.

123. The New Jersey Spill Compensation and Control Act ("Spill Act"), N.J.S.A. 58:10-23.11 et seq., prohibits the release or discharge of hazardous substances into the waters or onto the lands of the State of New Jersey and provides certain remedies therefore.

124. The Spill Act provides, in pertinent part at N.J.S.A. 58:10-23.11g.c(1), that:

> Any person who has discharged a hazardous substance or is in any way responsible for any hazardous substance shall be strictly liable, jointly and severally, without regard to fault, for all cleanup and removal costs…

125. The Spill Act further provides, in pertinent part at N.J.S.A. 58:10-23.11f.a(2), that:

> Whenever one or more dischargers or persons cleans up and removes a discharge of a hazardous substance, those dischargers and persons shall have a right of contribution against all other dischargers and persons in any way responsible for a discharged hazardous substance or other persons who are liable for the costs of the cleanup and removal of that discharge of hazardous substance.

126. There have been discharges, as that term is defined in the Spill Act, N.J.S.A. 58:10-23.11b, at, on, and/or under the EPEC Property relating to or arising from discharges from the NL Facility by NL.

127. NL is a "person…in any way responsible for any hazardous substance" under the Spill Act.

128. EPEC has incurred and will continue to incur cleanup, investigation, and removal costs in connection with the Radiological Contamination at the EPEC Property.

129. Under the Spill Act, NL is strictly liable to EPEC for any and all cleanup, investigation, and removal costs pursuant to N.J.S.A. 58:10-23.11g.c(1) relating to the Radiological Contamination located on the EPEC Property.

**WHEREFORE**, Plaintiff EPEC demands judgment against NL for EPEC's cleanup, investigation, and removal costs and for such other and further relief as the Court deems just and equitable.

**SIXTH COUNT**
**(Negligence as to Defendant NL)**

130. EPEC repeats and re-alleges the allegations contained in Paragraphs 1 through 129 of this complaint as if fully set forth at length herein.

131. NL had a common law duty to EPEC to conduct its operations at the NL Facility in a proper, safe, and reasonable manner that did not cause injury or damage to the EPEC Property.

132. NL negligently discharged waste containing Radiological Material into the Raritan River that came to be located on the EPEC Property.

133. Accordingly, NL has breached its duty to EPEC and caused damage to the EPEC Property.

134. NL's negligent actions and/or omissions are the proximate cause of the damages suffered by EPEC.

135. Accordingly, NL is liable for all costs that EPEC has incurred and will incur in connection with the investigation and remediation of the Radiological Contamination on the EPEC Property.

**WHEREFORE**, Plaintiff EPEC demands judgment against Defendant NL for compensatory, incidental, consequential, and punitive damages with interest and costs and

expenses of suit, including reasonable attorney's fees, and for such other and further relief as the Court deems just and equitable.

## SEVENTH COUNT
**(Strict Liability as to Defendant NL)**

136. EPEC repeats and re-alleges the allegations contained in Paragraphs 1 through 135 of this complaint as if fully set forth at length herein.

137. The discharge of waste material from the NL Facility to the Raritan River and/or the use of materials containing Radiological Material at the NL Facility constitute abnormally dangerous, ultra-hazardous activities that render NL strictly liable for all damages resulting therefrom.

138. NL acted willfully, wantonly, or recklessly and with indifference to the consequences of its actions, which renders NL strictly liable to EPEC for all compensatory and consequential damages, costs, and expenses incurred and to be incurred by EPEC in connection with and related to the investigation and remediation of the Radiological Contamination at EPEC Property.

**WHEREFORE**, Plaintiff EPEC demands judgment against Defendant NL for compensatory, incidental, consequential, and punitive damages with interest and costs and expenses of suit, including reasonable attorney's fees, and for such other and further relief as the Court deems just and equitable.

## JURY DEMAND

EPEC hereby demands a trial by jury on all claims in this complaint.

## CERTIFICATION PURSUANT TO L. CIV. R. 11.2

I certify that the matter in controversy is not the subject of any other action pending in any court, or of any pending arbitration or administrative proceeding, except as noted in this complaint,

and that no other parties should be joined in this action, except as otherwise set forth in this complaint.

        /s/ Michael T. Hensley
Michael T. Hensley, Esq.
BRESSLER, AMERY & ROSS, P.C.
325 Columbia Turnpike
Florham Park, New Jersey 07932
(973) 514-1200
Attorneys for Plaintiff EPEC Polymers, Inc.

Dated: March 15, 2018